We'll hear argument next in Lefkowitz v. Synacor, 19-4232. Mr. Eagle. Good morning, Your Honor. Lawrence Eagle, Gregory Linsquile. May it please the Court, this morning I'd like to discuss four issues in which the Court below erred. First, while citing the familiar standards for evaluating a motion to dismiss, the Court applied a more difficult standard, a defendant-friendly standard, and in doing so the Court failed to accept the complaint's specific factual allegations and draw all reasonable inferences in plaintiff's favor. Second, the complaint fairly alleges that at least by November 2016, which we're now talking about the third amended, the proposed third amended complaint, that it alleges at least by November 2016, the beginning of the modified class period, and certainly by August 2017, that defendants knew that their statements regarding expected $100 million in revenue from the AT&T contract were false. Defendant's statements regarding the expected revenue from the AT&T contract were contradicted by existing facts that defendants knew. Confidential witnesses confirmed, certainly by August 2017, that AT&T had made it clear that it had dialed back on advertising and that its focus was on user engagement and not monetization of the portal. That was revealed. I mean, that was disclosed, that they were cutting back on monetization. That was disclosed actually in August of 2017, was the first time in which they disclosed that as a joint decision. It was not disclosed in November 2016, and it had already been known by the company right after the initiation of the contract back in May of 2016. All of the confidential witnesses had said right off the bat AT&T had focused its on user engagement and not on monetization. The first disclosure of any decision to focus on user engagement as opposed to monetization was in August, in which it was said that it was a joint decision, a statement that we later learned was not true, that it was not a joint decision, but it was AT&T's control over the contract. And AT&T's main focus was to focus on user engagement to the exclusion of monetization. And that was finally disclosed in March 2018. And I think the disclosure in March of 2018 is a fact the confidential witnesses have said was known to the company long before March of 2018. And it was only because the company had no choice. By March of 2018, it had failed to meet any of the projections and any of its statements. Why isn't this fully consistent with your clients? I mean, with the companies having a very optimistic view of how this deal is going to go down and that they are just simply hoping everything's going to work out. They don't want to go out and announce a disaster yet because there is no disaster yet. And there's a give and take between AT&T and this company. Do they have to report right out after every meeting and issue a press release? No, Your Honor, they don't. And I think what they don't have to do, however, is start off in May of 2016 when the contract is introduced and promote $100 million in revenue from the AT&T contract. That was their sort of a banner statement. As a result of that disclosure, the stock price went up 158 percent. So when the company chooses... That number was obtainable from the Yahoo situation. And so they could be optimistic that they could just simply step in the shoes of Yahoo. They didn't say they could just be optimistic. But even if they reasonably believed it at that moment in time, even if at the time they made that announcement, they reasonably believed $100 million. The question is, Your Honor, when did they have to disclose the fact that AT&T had now shown its cards, AT&T was focused on user engagement, not monetization. Facts that six of our confidential witnesses have said they were aware of that AT&T focused on dial back on advertising. Confidential witness four said he was fired because he tried to say to the company that estimates of future revenues were overstated. This was a game-changing contract. This was not just ordinary projections. This was a game-changing contract, the largest contract in Cinecor's history as far as a single customer. It was going to double revenues according to Cinecor and in projection or estimate. So that this was a focus of the company's attention, part of each of the disclosures. And what we say is, and what we cited in several of the paragraphs are analysts' attention to this contract. Analysts were quite sensitized to the contract. And in several instances, analysts monitored the company's statements concerning the contract. So that in August 2017, when they said it was only delayed, analysts took note of that. The stock price decreased, but analysts said, well, we're not that concerned because it's still on the horizon. It's still going to be coming. And that also happened subsequently in November. What you have here is the duty to reveal the truth. And the company here did not reveal the truth. They certainly, I think it's important that the company had a shelf registration. They announced the contract in May. In November, they continued to promote the $100 million worth of revenue. And they promoted shortly before they filed the shelf registration. Then in March of 2017, they again reiterate the $100 million contract. They don't mention, all they do is they acknowledge a delay. They still say we're on track. They still say that we're going to make $100 million. And in March, this is in March of 2017, within days thereafter, they filed a shelf registration. They raised $20 million. They don't say to people that AT&T is focused on monetization. They don't, I'm sorry, focused on user engagement as opposed to monetization. They actually reassure the arresting public that all is well with the company. It's just a matter of delay. And I don't think based upon the statements that our confidential witnesses have said, you can draw any inference other than if you accept those statements as true. And we have identified each one of them. And I was going to summarize them. But largely, every one of the confidential witnesses said that AT&T had indicated, said that it was focused on user engagement to the exclusion of monetization and that defendants knew that this was the case. They were at weekly meetings in which this was discussed. Thank you, Your Honor. Thank you. We'll hear from Mr. Bongiorno. Thank you, Your Honor. May it please the court, Michael Bongiorno, on behalf of the defendants. As the court knows, the Second Circuit has repeatedly held that companies are not liable simply because they don't predict the future with perfect accuracy. Alleging fraud by hindsight is not enough to survive a dismissal of a securities fraud claim. And that's exactly what we have here. So the argument, as I understand it, is that there was information that was material, that would have been material to the investors available at least as of March 2017 that was until August 2017. So we're in material omission land, even in the context of Omnicare, that may be cognizable. So can you just address that? Certainly, Judge O'Leary. I would like to address that for sure. And I'll address that right now. There are two issues that the court raises. One is, where are we? Is it Omnicare, or is it simply a forward-looking statement under the PSLRA? And our view, of course, is that these are all forward-looking statements. To the extent that there's any materiality associated with what's being said, it's a forward-looking statement. It's accompanied by meaningful language. Actual results may differ, et cetera. That's right in the statute. And the statute itself is very clear in the PSLRA that the safe harbor applies not just to what's said, but what is not said. It applies to omissions. So despite what the plaintiff says, the PSLRA applies to omissions. And this case can be affirmed on that basis. But the court asked me a different question, which was about Omnicare. So I will address that as well, although I do I'll tell you why, because this is of interest to me, this overlap between the PSLRA and Omnicare, because so many forward-looking statements are, in a sense, opinions, forecasts about the future. And it seems to me, and I want to make sure you answer the question you're about to answer, but it does seem to me that there's either a tension or a substantial overlap. I'm trying to figure out which. Between the safe harbor, but also the Omnicare-related cases like Sanofi, and so on. Certainly. And I don't think it's a tension. I think it's just that there are two different ways to view the potential for dismissal here. So I'll start by talking about the PSLRA, but I promise I will talk about Omnicare as well in a moment. Because the PSLRA itself, which Omnicare certainly didn't didn't alter in any way, states that in any private action arising under this chapter that is based on an untrue statement of material fact or omission of material fact necessary to make the statement not misleading. So and then it goes on to apply the standard that we're all familiar with and the different prongs of the PSLRA and the safe harbor, which are disjunctive. And I think this case and the statements in this fall fairly squarely under the first one for forward-looking statements accompanied by meaningful cautionary statements identifying important factors. And for oral statements, it pretty clearly says that that can be complied with if there is a statement that actual results might differ materially from those projected in the forward-looking statement I'm reading directly from the statute. And of course, when CenterCore made the statements it made that are being challenged, it said actual results may differ right in the preamble to the analyst conference call. So I think that a case like this can be disposed of simply under the PSLRA without digging into the prong three of Omnicare and Tong and what it means to omit something. But if we go to Omnicare and we view these through a lens of opinion statements, and certainly there are projections that can also be opinions, but I think the statute protects them whether they're opinions or not. But to the extent anything that CenterCore said in this case is considered to be simply an opinion and not a projection for whatever reason and therefore not protected by the PSLRA, it still isn't actionable under Omnicare. And I think the plaintiff's focus when they look at Omnicare is on the omissions piece and that's certainly what the court focused on in its question. And I don't think that there's anything material that's omitted here. The High Crush case that counsel mentioned is a case where a contract, a very important contract, had blown up and there was a dispute over whether or not the repudiation of the contract was legitimate. In this case, CenterCore most certainly disclosed in a timely manner when the contract was signed and when there was a notice of non-renewal under the contract that's in the amended complaint. That wasn't until after the class period. So instead what we have is a very odd class period in the proposed third amended complaint, and I'll note that it is a third amended complaint, but the class period actually now starts on bad news. The class period starts when the company, and I think Judge Walker referred to this briefly or at least alluded to it, the company is announcing that the official launch of the portal is being pushed back from Q4 of 16 to the first half of 17. That's the announcement that starts the proposed new class period. That's the company doing what it's supposed to do. It made a projection. It said that the projection was forward-looking. It said actual results might differ. It said if things don't go well with AT&T, we might not achieve that revenue. We might not achieve a profit. It will have a substantial impact on us. And oh, by the way, we're trying to get this thing going, but it's not going to start now. It's going to start later. And then eight and a half months later, they give another update that's negative. They talk about another delay, a longer ramp to monetization, moving at a more deliberate pace. They're doing what the plaintiffs say they're supposed to do, which is give updates on what's going on. Are they required to say every single thing that's happening at every moment? Of course not. That would be impossible. That would confuse the market. That would cause the stock to bounce up, down, and sideways constantly. And there's no case that says they're supposed to do that. And all we have here are some projections that have a very clear and obvious reasonable basis. The plaintiffs have said multiple times in their papers, you can't use Yahoo as a benchmark. That's unreasonable. They had a lengthy relationship with AT&T. You're a small company. You have a brand new relationship. Well, first of all, obviously the market knows all that and they can weigh it as they choose. But second of all, we weren't starting from scratch. We weren't starting with zero customers and having to ramp up over 10 years. AT&T had already done that work and AT&T had every incentive to keep their portal successful. And obviously they didn't move it to Cinecorp so that it could fall apart and they could start from scratch. They moved it to Cinecorp for a reason and the contract itself. I'm still thinking as you're speaking about the more fundamental question of how we distinguish between a case that is covered by Omnicare and connected with an opinion statement and a case that is really about what you describe as projections that therefore are covered by the PSLRA. And I know that part of your answer is I win either way. It doesn't really matter, Judge, so don't bother me. But it's analytically potentially important and doctrinally important to be able to distinguish those two. And in Sanofi, it seemed to me that those were projections or could have been described as projections about what the FDA was going to do or not going to do with this study. Is there an argument that this is not an opinion statement? Well, I mean, is it an opinion? Sure, it's an opinion. But that doesn't mean that it has to be analyzed solely under Omnicare and that the PSLRA no longer applies. If that were the case, then the Omnicare would swallow the PSLRA and we wouldn't need to look at the safe harbor anymore. That's what I'm trying to understand. Where is that space? So I think that it's sort of a Venn diagram and there's plenty of overlap. There are many, many opinions, and I know the court knows this, so forgive me for saying it. There are many opinions that aren't projections, including the hypotheticals that Justice Kagan talked about in Omnicare about the resolution of the televisions and things like that. So those are opinions and they're not projections. But in terms of, is a projection an opinion? Certainly it often is, and it can be analyzed under Omnicare, but that doesn't mean it's not afforded the projection of the PSLRA. So I'm not trying to make the heads or tails or lose argument, but I am trying to say that it is analytically tricky and that the Tong case that the court's referring to that analyzes Omnicare quite carefully and is in the context of opinions regarding clinical trials and the like is a case that is clearly one that is in the middle of that Venn diagram that overlaps between the two. So is it doctrinally important? Absolutely. I agree. We dealt with that as an Omnicare problem, not as a PSLRA problem. Yes, you did, Your Honor. Yes, you did. The Second Circuit certainly did that, but I don't think that they had to, and I don't think that they have to here, but I think that, and I'll say it again, forgive me that even if this court chooses the Omnicare route as opposed to the Safe Harbor route, either way, it's pretty clear that there's nothing missing. Now, I suppose one way to try to reconcile them would be to say that a forward-looking statement loses its protection if it is truly missing something that is significantly material, so that the cautionary language can't save you if you're making a projection that is missing some awful fact. If AT&T had faxed us a letter saying, we're not doing business with you and you're never going to see another penny from us, I would still be standing here arguing that we're protected from the Safe Harbor because we had reasonable cautionary language, but it would be a much harder argument and you would be telling me that that's a material omission even under the PSLRA, never mind Omnicare, so I think that there are ways that we can analytically make those two doctrines work together and not in tension with each other, but here, this isn't nearly hard enough a case that we have to figure that all out today, but if we do, I think we win. Thank you very much, Mr. Eagle. I'd like to just address the tension the court has identified concerning the PSLRA and Omnicare, and I think that that tension is addressed by whether or not the cautionary language is adequate in light of the specific risks. Mr. Eagle, you're breaking up just a little bit. I don't know why. I'm not sure why either. Is that a little better? Yes, yes. Whether or not the specific risks that were identified, whether the general projections, in this case, we have a specific contract, a specific contract in which the company said we're getting $100 million from this contract. That is not we're going to earn in the first quarter $50 million, we're going to earn $25 million in the first quarter from all of our investments. Shareholders were entitled to know the specific risks associated with that one contract. So, the PSLRA's protection for forward-looking statements requires disclosure of all specific material risks associated with known risks by the company, and in this case, the known risks by the company, certainly by November 2016, was that AT&T was confident. There was all this cautionary language. The cautionary language, in general, did not deal with the AT&T contract and did not deal specifically with monetization of the AT&T contract and the focus on user engagement to the exclusion of monetization. I think that ultimately what was disclosed in March of 2018 was what was known in November 2016 and certainly in August 2017. What was known and disclosed in March of 2018, finally, and it was material in March of 2018, and the only reason why they came clean was because they were not meeting their results and they weren't meeting the results consistently and they had to explain that. They would otherwise question whether they would have disclosed it, but what they disclosed was going on from the beginning. It was a material fact that investors wanted to know. When you look back, and I mentioned a little bit about investments, my counsel says, well, these were just generalized projections and it's interesting that we start the class period when Cinecorp discloses a delay in revenues, but the statements that Cinecorp made certainly didn't give investors the belief that, oh, this is just a delay, that this is bad news. In fact, what Cinecorp said was our overall financial expectations for our contract with AT&T remain very much on track with expected full-year revenue of $100 million after deployment is complete and continue, and so I don't think it should really impact what one might be expecting of our revenues from AT&T in 2017%. At what point did their duty to disclose this information arise? Certainly when they became aware of the fact that AT&T was focused on user engagement to the exclusion of monetization, we argue that we believe and we started the class period. It was in November of 2016, but even if it wasn't November 2016, which is the beginning of our class period, then it certainly was prior to the time they did a shelf registration in March of 2017, and then certainly in August of 2017, they made a partial disclosure, which itself was misleading because it was described as a joint. So are you suggesting that that duty arose independent of whatever projections it was making about future revenue? No, I think it's the embedded fact that under Omnicare, I think it is the fact that when they said that we're expecting $100 million, what they were saying was they were not saying that AT&T was going to focus on user engagement as to the exclusion of monetization. It was the key embedded fact. Investors were led to believe that, in fact, this was full steam ahead, and there was no reservations concerning the ability to earn these revenues. There were no conflicting facts. It's true not every conflicting fact needs to be disclosed. There are facts putting it the other way that don't have to be disclosed. This was a critical fact. This fact ultimately was disclosed in March 2018, but was known throughout the class period as confidential witnesses have said, and that's the thrust of our, that's the heart of our case, Your Honor. It is that Synicor, and why did it do so? It sort of goes with once you float that $100 million, we're going to be just like Yahoo, and it wasn't just a generalized, it was about this contract, and it was about what Synicor was going to do with this contract, and then when confidential witnesses disclosed that Synicor knew that wasn't happening, first it was just delay but not come clean. Keep saying we, and I think we've quoted from various investment analysis, and I think it's important. In 2016, Ladenburg Phelan says, that said, assuming the company is more or less on schedule, the value creation from the contract is unchanged by revenue shifting from one quarter to the other. So the fact that it was delayed was not going to, nobody said it wasn't going to happen, they said, or that there was some concern about it. What they said is it's just shifting from one quarter to another, and I think that happened again in March, in which there was again guidance, again in the investment company, and it effectively, I think it's in our third amendment, proposed third amendment complaint, that the investment community was focused on the AT&T contract as a game changer for Synicor. Synicor repeatedly and continuously stated that it was going to obtain expected $100 million and the $330, $300 million, and it knew those statements were not true. The language it uses, the cautionary language, the cautionary language of generalized results may differ, is not adequate under Omnicare or under the PSLRA's forward-looking statements. I wonder if I could, I just have a very brief question here, Mr. Eagle. Throughout your brief, you used words such as, on page 68 and on page, in paragraph 52 of the complaint, in paragraph 68, about focusing on customer engagement to the Also, throughout the complaint, I sensed that the complaint is based on a theory, and your argument here today, that monetization and customer engagement are conflicting goals, are somehow mutually exclusive. Can that really be sustained, though? In other words, isn't it a business decision whether or not you satisfy the customer's needs in order to have more traffic on the website to see the advertising and be able to do the searches? In other words, maybe Synicor and AT&T did not see it the same way, but does that necessarily mean these were mutually exclusive goals? Can you shed a little light on that aspect for us? These are mutually exclusive goals in this context. In all contexts, maybe not. But in this context, Synicor makes money off of advertising, clicks and revenue from those clicks. You have to have people looking at it, and they're not going to do that in a competitive environment unless you have what would be called customer engagement, correct? Certainly, you need some customer engagement. Exactly, or you wouldn't have people looking at the advertising or doing the searches. There's no question you needed some customer engagement. But in the context of a portal like Synicor had for AT&T, the focus was not on creating as much revenue as necessary, but it was on the user's engagement. It matters in the click world. It matters how many advertisements pop up. To some degree, there's less user appreciation of a site if there's more pop-ups, more advertising. If there's a focus on advertising on a particular site, then it's less user-friendly or less user engagement. It is certainly significant, and we believe it is consistent with the disclosure in March of 2018, in which the company says AT&T alone has chosen to prioritize consumer experience and engagement over monetization. That's the word, though. Prioritize, not to the exclusion. In other words, I'm confused that in some places in your complaint, you say that AT&T didn't want to do any monetization, but in other places, you seem saying it was prioritization. Can you clarify? I want to make it clear. We did not say that AT&T didn't want to do any, or we do not want to allege that AT&T didn't want to do any monetization. It was simply a matter of how much monetization. In Synicor's world, the best monetization is more advertising dollars. In AT&T's world, and to arrive at the $100 million projection, you had to focus on advertising and not monetization. That is what all of the confidential witnesses said. We're relying that the allegations concerning focus on user engagement to the exclusion of monetization is based upon the comments of the top six confidential witnesses that we've identified, who all said that AT&T said they were dialing back on revenue and that they were going to, and that was where they were, and not going to do as much revenue. I take it part of your argument would also be that the stock price dropped steeply when the investing public gave that information about AT&T's priorities. Correct. Exactly. It had some alleged effect, at least. I don't see just Walker, but I think I would hear him. I'm here. Okay. The case is submitted. We'll reserve decision.